



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

MICHAEL S. LANE
    Vs.                             C.A. No.     2017 CA 004197 B
DISTRICT OF COLUMBIA

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each Judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to: Judge WILLIAM M JACKSON
Date:  June 19, 2017
Initial Conference: 9:30 am, Friday, September 15, 2017
Location:  Courtroom 219
          500 Indiana Avenue N.W.
          WASHINGTON, DC 20001                 Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief    Judge    Robert    E.    Morin

Caio.doc

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Telephone: (202) 879-1133

Michael Lane
_____
                              **Plaintiff**

vs.                                              Case Number  **2017 CA 004197 B**

The District of Columbia
_____
                              **Defendant**

### SUMMONS

To the above named Defendant:  **District of Columbia** .
               **Serve: Muriel Browser**
        You are hereby summoned and required to serve an Answer to the attached Complaint, either
personally or through an attorney, within twenty (20) days after service of this summons upon you, exclusive
of the day of service. If you are being sued as an officer or agency of the United States Government or the
District of Columbia Government, you have sixty (60) days after service of this summons to serve your
Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The
attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed
to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue,
N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on
Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on
the plaintiff or within five (5) days after you have served the plaintiff. If you fail to file an Answer, judgment
by default may be entered against you for the relief demanded in the complaint.

Donald M. Temple, Esq.
_____                    *Clerk of the Court*
Name of Plaintiff's Attorney

1310 L Street, N.W. #750
_____      By _____
Address                                            Deputy Clerk

Washington, DC 20005
_____

202-628-1101
_____      Date  **06/19/2017**
Telephone
如需翻译, 请打电话 (202) 879-4828   Veuillez appeler au (202) 879-4828 pour une traduction   Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오   ተጠይቆ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

        **IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU
ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT
MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE
COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR
REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS
ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._**

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the
Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500
Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

                           See reverse side for Spanish translation
                           Vea al dorso la traducción al español

FORM SUMMONS - Jan. 2011                                                        CASUM.doc





### TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
**DIVISIÓN CIVIL**
500 Indiana Avenue, N.W., Suite 5000
Washington, D.C. 20001 Teléfono: (202) 879-1133

_____
                              **Demandante**

                    contra

                                            **Número de Caso:** _____

_____
                              **Demandado**

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veinte (20) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante al Juez ya sea antes que Usted le entregue al demandante una copia de la Contestación o en el plazo de cinco (5) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                    *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                          Por: _____
_____                                Subsecretario
Dirección

                          Fecha _____
_____
Teléfono
如需翻译,請打電話 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Dĩ có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828 로 전화주십시오.      የאማርኛ ተርጓሚ ከፈለጉ (202) 879-4828 ይደውሉ

**IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO, O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍAN RETENERLE SUS INGRESOS, O PODRÍAN TOMAR SUS BIENES PERSONALES O RAÍCES Y VENDERLOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.**

Si desea conversar con un abogado y le parece que no puede afrontar el costo de uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse de otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

                                                            CASUM.doc

**Filed**
**D.C. Superior Court**
**06/28/2017 10:55AM**
**Clerk of the Court**

# SUPERIOR COURT OF THE DISTRTICT OF COLUMBIA
## CIVIL DIVISION

MICHAEL S. LANE                )
1334 Locust Rd. NW             )
Washington, DC                 )
20012                          )
    Plaintiff,           )
                     )
                     )     Civil Action No. 2017 CA 004197 B
                     )
    v.                     )
                     )
DISTRICT OF COLUMBIA           )
(A Municipal Corporation)      )    **JURY DEMANDED**
441 Fourth Street, N.W.        )
Washington, DC 20001           )
                     )
Defendant.                     )
                     )
Serve:  Honorable Muriel Bowser, )
  Mayor of the District of Columbia )
c/o Tabitha Braxton, Staff Assistant )
Gladys Herring, Executive Assistant; )
or Designated Representative   )
Executive Office of the Mayor  )
1350 Pennsylvania Avenue, N.W., )
Suite 316                      )
Washington, DC 20004           )
                     )
Serve: Honorable Karl A. Racine, )
Attorney General, District of  )
Columbia                       )
c/o Designated Representative  )
Office of the Attorney General for D.C. )
441 Fourth Street, N.W.        )
Washington, DC 20001           )

---

1

## AMENDED COMPLAINT

## INTRODUCTORY STATEMENT

Comes Now Plaintiff, Michael S. Lane ("Plaintiff" or "Mr. Lane"), by and through the undersigned counsel and respectfully brings this civil action for age and race discrimination, and for declaratory and equitable-injunctive relief against the District of Columbia Government (Department of General Services-Construction Division), pursuant to District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01, et seq.; Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended; 42 U.S.C. § 2000e, et seq.; 42 U.S.C. § 1981a via 42 U.S.C. § 1983; and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq.; for relief from discrimination based on his race (African American), and retaliation..

The underlying claims derive from an illegal, retaliatory realignment and reduction in force involving the rights of Plaintiff (and other similar older African-American employees) who sought to redress their employment rights. Plaintiff at all times referenced herein was placed on an "EG pay plan associated with the District of Columbia Public Schools ("DCPS") although he had been transferred, by law, from DCPS into Office of Public Education Facilities Management and Construction Authority (OPEFM) in June 2007 by the District of Columbia Public Education Reform Amendment Act of 2007"; Section 701. Pursuant to this law, which is also referenced as the "District of Columbia Public Education Facilities Management and Construction Authority," DGS prepared and relied upon a Transition Plan for OPFEM, dated December 3, 2007, which indicated pay parity for all EG employees. In 2011, then Mayor Vincent Gray and the City Council passed the Department of General Services Establishment Act of 2011 and abolished OPEFM and DRE. Plaintiff, however, was never converted to the DGS classification and thus never received pay equity.

2

## PARTIES

1.      Plaintiff, Michael S. Lane ("Mr. Lane"), was an employee of the District of Columbia Department of General Services – Construction Division through July, 2015.  He resides in the District of Columbia ("DC") and is a United States citizen. Mr. Lane enjoyed twenty (20) years of service with the DC Public Schools, OPEFM and DGS.  On November 13, 2003, highly qualified as a D.C. Licensed Architect with, a Bachelors of Architecture, a Masters of City Planning, and a Masters of Computer Science, he was promoted to an Architect Grade 13, Step 10.

2.      Defendant, District of Columbia ("Defendant"), is a governmental organization and municipal corporation; its Department of General Services, Construction Division, a subordinate agency, is headquartered at 441 Fourth Street, N.W., Washington, DC 20001.

## JURISDICTION AND VENUE

3.      Jurisdiction for this matter lies with the Superior Court of the District of Columbia, pursuant to D.C. Code § 11-921. This Court enjoys personal jurisdiction over Defendants under D.C. Code § 2-1401.01, et seq., and D.C. Code Ann. § 13-423(a).

4.      Venue is appropriate because a substantial part of the events or omissions giving rise to this Complaint occurred within the D.C. District General Services Constructions Division, in D.C.Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.

## EXHAUSTION OF REMEDIES

5.      Plaintiff timely exhausted his administrative remedies with the Equal Employment Opportunity Commission ("EEOC").  On or around January 29, 2016, Plaintiff timely contacted the EEOC and subsequently filed a Charge discrimination of and retaliation with the EEOC

alleging discrimination based upon his race (African-American) and age based upon a hostile work environment, in violation of his rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and the DCHRA. Plaintiff's Charge of Discrimination was cross-filed with the District of Columbia Office of Human Rights ("DCOHR").

6. Plaintiff timely files this action in accordance with the EEOC's Dismissal and Notice of Right to sue, which provided Plaintiff the right to file this Complaint within ninety (90) days of *receipt* of the Notice, postmarked March 17, 2017. See EEOC Charge No. 570-2016-00493.[1]

## FACTS COMMON TO ALL CLAIMS

7. Mr. Lane, age 66, has been a DC government employee since 1990. Until his position as an Architect-Designer was abolished on July 2, 2015, he was employed at the D.C. Department of General Services ("DGS"). His skill set exceeds the requirements stipulated by OPM standards. He has over thirty (30) years in the design profession. He has approximately twenty (20) years as a DC Government Architect, Engineer Technician, and Project Manager. He graduated with a 5-year Bachelor Degree of Architecture, a Masters of City Planning Degree, and a Masters of Computer Science Degree. He has been a licensed Registered Architect in the District of Columbia since 1998 and completed Engineer Officer Basic and Advanced courses for the US Army Corps of Engineers. At least one additional employee, Eileen E. Jenkins, is a similarly situated architect at DGS.[2]

8. Until his termination, he was an Architect 0808, Grade 13/10.

---

[2] / Eileen Jenkins has filed a similar action in the United States District Court for the District of Columbia. CA. No.15 cv 2080.

4

9.      In 2008, the D.C. Government, by statute, transferred employees of the DC Public Schools ("DCPS") Facilities Management Division to the Office of Public Education Facilities Modernization ("OPEFM"). Then Mayor Fenty authorized transfer of Wage Grade employees represented by the International Brotherhood of Teamsters and Educational Grade non-union employees) to a new agency administered by then Executive Director, Mr. Allen Y. Lew.

10.     In 2008, Mr. Lane earned an annual salary of $72,702 as an EG Grade 13 Step 10. Subject to legislation, he and a small group of seven older employees' salaries should have been converted; he should have thus earned $92,782 as a CS Grade 13 Step 10. .

11.     In 2011, then Mayor Vincent Gray and the City Council passed the Department of General Services Establishment Act of 2011 and abolished OPEFM and DRES.

12.     DGS attempted to transfer EG employees, including Lane, in accordance with the 2007 Education and 2011 DGS Establishment Acts passed by the City Council.

13.     The DGS Establishment Act of 2011, DC Act 19-93, Section 1005, (a) provided: "all functions assigned, authorities delegated, positions, personnel, property, records and unexpended balances of approximations, allocations and other funds available or to be made available to the Department of Real Estate Services ("DRES") and Office of Public Education Facilities Modernization are transferred to the Department."

14.     Internal architectural and engineering services and quality assurances related to the delivery of professional A/E services was mandated by law to be transferred. The federal government does not employ or classify Project Managers but the occupation was established by the District Government by using OPM guidelines for General Engineer or Design/Construction Analyst.

15.     On October 1, 2011, upon the establishment of DGS, Lane was transferred from OPEFM to DGS.  DGS also received employees from DRES and functions related to the mission of DGS from MPD, DPR and FEMS.

16.     Although the 2011 merger required employees, once again, to be transferred this time to DGS, Plaintiff and seven (7) elderly African-American EGs were not.  They remained in an obsolete, illegal classification status on an unlawful 2006 pay scale.  Until his termination, Lane while working for DGS remained classified as a DCPS employee, despite years of protest.

17.     DGS Director Lew failed to properly convert Lane's classification from the DCPS EG classification to proper DGS classification and pay scale.  Although physically working for DGS, with a budgeted and appropriated slot, he remained on DCPS's payroll, which thus gave DGS funds for positions (his and others) that did not exist.

18.     DCPS thus directly expended funds out of its budget to pay absentee, transferred EG classified employees to DGS, which should have been used to otherwise pay salaries for principals and teachers.  In the absence of an authorized intra-agency transfer of funds from DCPS to OPEFM, DGS violated federal and District Anti-Deficiency Laws. Just factoring the salaries for paying seven older African-American EG employees, which includes Lane, the cost to DCPS is estimated to be more than $3-million. With the $3-million in cost savings to DGS was able to effectively use the funds for other purposes.

19.     Moreover, Plaintiff' and his seven colleagues' salaries have not been properly adjusted since 2006.

20.     In 2008, Plaintiff and his older colleagues, then assigned to DCPS, received a one percent cost of living increase, but have received no cost of living increases since.

6

21.     Rather than effectuate and correct a policy infirmity and compliance with the law, and convert Plaintiff to the position which he should have enjoyed in 2008, DGS attempted to conditionally transfer the EGs to a Career Service classification in DGS subject to them first reapplying for their positions.

22.     According to DC Personnel Regulations Chapter 8 Paragraphs 805.2(b) and 817.1, the District can transfer employees from one independent agency to another agency without requiring employees to reapply for their positions.

23.     Plaintiff therefore insisted upon equal unconditional placement in a position vested with the same title and series, same grade and step, to which he was entitled as a statutorily converted employee, with a significant increase in salary to compensate him for the government's failure to have properly converted, reclassified, and compensate him.

24.     Subsequent to the 2011 DGS Establishment Act, DGS hired many new employees – including younger employees, less qualified than Mr. Lane, placed them on the new pay scale and paid them higher wages.  For example, it hired "AG" in 2013 as a CS Grade 13, Step 10 with an annual salary of $95,564. By comparison, DGS proposed to pay Mr. Lane, conditionally upon him being re-hired at a lesser CS Grade 13, Step 2, with an annual salary of $76,548.

25.     DGS also limited a long awaited cost of living increase to Mr. Lane to  $2,796, which increased Mr. Lane's pay from $69,906 to $72,702, the maximum that he received up to that point during a twelve-year period from 2003 to 2014.

26.     Mr. Lane, as well as his fellow DG employees, consistently sought to rectify the pay and classification disparity, which was peculiar only to seven (7) elder employees. These efforts included ongoing communication with management and correspondence to DGS management in which they expressed concerns about age and race discrimination.   Among other times on

March-April, 2014 Mr. Lane complained to DGS management about the pay _____ and concerns regarding age discrimination.

27.     The affected employees consistently complained to DGS management regarding their pay disparity status.  On June 16, 2014 Eileen Jenkins filed a complaint on the basis of discrimination (race and age) and retaliation against DGS on the basis of the aforementioned pay disparity.  In that complaint, she stated that she was a part of a group of employees that were being denied fair compensation-who were mostly African-American and over age 50.   Her complaint was disclosed to Mr. Anthony Clark in the DGS Director's office, and to Corlie Adams in the DGS General Counsel's Office.  See Exhibit A.

28.     On or around September 19, 2014, on Plaintiff's behalf, the undersigned attorney corresponded directly with Cecelia Bankins, Administrator for DGS in the area of Human Resources.[3]   Counsel noted that the subject employees, including Mr. Lane, were senior in age and status and should be treated equally.  He also noted that the Agency had been treating Plaintiff and others inequitably.  Mr. Temple notified DGS that he would protect his client from being denied proper compensation per District and federal laws DGS Deputy General Counsel, Mr. Charles Brown Esq., responded via a December 4, 2014 letter that denied "any disparate treatment of these employees based upon age or any other protected status." Regrettably, DGS eventually retaliated by terminating the Complainant with a RIF founded on a manufactured realignment to get rid of a problem.

29.     On May 11, 2015, DGS Interim Director Jonathan Kayne sought approval from the Director of the DC Department of Human Resources, the Deputy Mayor, and the City Administrator, to conduct a reduction in force specifically for Seven (7) positions in the Administrative Support and Capital Construction Divisions of DGS to finalize a realignment of

---

[3] That letter was copied to the Directors of DGS – and to certain D.C. City Councilmembers.

the DGS pay and personnel structure that came into effect on January 2, 2014. The RIF, based on an unlawful realignment, focused exclusively on seven (7) employees in an agency with approximately 600 employees.

30.     Pursuant to DC Personnel Regulations, a RIF is predicated on Reorganization or Realignment and a lack of work or insufficient funds.

31.     Although DGS states that it was in compliance with Reorganization and Realignment guidelines, DGS had not proffered any document that indicates the City Council approved a reorganization as required by DC Regulations, or that there was a lack of funds for the seven (7) positions.

32.     Rather than address Mr. Lane's concerns, DGS via Mr. Rashad Young, the City Administrator, and DGS Director, Jonathan Kayne, retaliated; they put into play an unlawful Agency realignment and Reduction-in-Force ("RIF"), directed exclusively to the aforementioned seven (7) elderly African-American employees. Retaliatory in nature, this RIF was designed to force Plaintiff and his older colleagues to either accept positions other than those to which they were entitled as a result of applicable law, or alternatively to effectuate their terminations, which is precisely what happened with Mr. Lane.

33.     Prior to the RIF and by no later than 2008, the District Government should have transferred Plaintiff to Career Service in 2008 and ensured his proper classification and compensation level. It did not, nor did it so in 2011. Rather, its delayed action increased its exposure and unwillingness to pay Plaintiff back pay and to correct his and other employees' classifications and compensations. Lane and his fellow older African-American employees were placed in a personnel and classification purgatory for an eight-year period. Despite that the 2007 Education Reform Act and the DGS Establishment Act of 2011 ordered the transfer of all assets,

9

personnel, and funds, neither the Fenty nor Gray mayoral administrations complied.  Rather, DGS proffered various different employment scenarios, including the aforementioned RIF, but at no time sought to remedy Plaintiff's employment status or to properly apply applicable law.

34.     On January 29, 2016, Mr. Lane filed discrimination and retaliation charges with EEOC (and DCHR) Washington, DC Field Office.

35.     During the RIF, Plaintiff was not offered a position. Nor were there any comparable positions posted online as mandated by the District Personnel Manual (E-DPM Instruction No. 31B-14).

36.     A year prior to the RIF, DGS offered Lane a position at his title and grade with a salary loss and no acknowledgement of its illegal classification of Mr. Lane or back pay due as a result, and further imposed a reduction from Step 10 to Step 2 and slight salary increase.  However, that increase did not adequately address the discriminatory unequal pay for the prior seven (7) years. To be clear, were Mr. Lane to have accepted the proposed DGS classification,  he would have been paid the same annual salary as "CF",  a younger Caucasian male, hired April 8, 2013, despite his seniority and twenty (20) years of service with the District Government.

37.     The abolishment of Plaintiff's position was directed specifically to Mr. Lane as retaliation for his persistent ongoing complaints about the government's illegal actions and treatment of him and his colleagues on the basis of their age and race and based on a two-fold fraudulent/false premise:  1) that the agency lacked funding for Plaintiff's position and 2) that the agency no longer needed Plaintiff's expertise.

38.     Pursuant to the 2007 Education Reform Act, Title VII, Section 704(5), the Director was required to employ an Architect to review design. A Design Unit was documented in the Transitional Plan prepared by Allen Y. Lew for approval by the City Council pursuant to the

School Modernization Financing Act of 2006. The DGS Establishment Act of 2011 mandated all functions to be transferred from OPEFM to DGS. The Design Unit performed a very important function to insure quality assurance to deliver A/E services for improving existing facilities and new construction.  Further, the Agency is now soliciting the same specific architectural services that it then declared it no longer needed from Plaintiff. See Attachment.

39.    DGS's RIF was designed to "cover-up" the alleged misuse of capital funds with the potential of violating criminal Anti-Deficiency Laws, disregard DC Laws passed by the City Council, and abuse DC Personnel Regulations to suppress unlawful acts.

40.  On June 1, 2015, DGS notified Mr. Lane that within thirty (30) days he would be terminated, on July 2, 2015, pursuant to its RIF.

41.    Prior to July 2, 2015 and thereafter, DGS employed similarly classified younger and Caucasian employees.

42.    The District Government personnel classification and series system is predicated on the US Office of Personnel Management (OPM) criteria. The OPM criteria for all job occupations states the pay grade is based on the skill level of work required, work experience and education necessary for job performance. Consequently, to suspend the EGs' lawful salaries by failing to place them on the proper pay schedule at the current grade and step is not in conformance to OPM criteria.

43. As further proof of DGS's motive and intent to not compensate Mr. Lane and Ms. Jenkins, and to correct their past pay disparity, DGS has determined that the precise design services which these two (2) architects were to provide DGS are still required.  Rather than retain and properly compensate them, DGS however, determined in conjunction with their termination, to illegally privatize those services. On May 10, 2017 DGS issued a bid for a General Design

Consultant firm to perform general design services.  See Exhibit B.   This proposal confirms DGS' intention to hire an Architectural/Engineering consultant firm(s) to perform duties that Mr. Lane and Ms. Jenkins were performing.  This course of action evidences DGS violation of personnel regulations to unlawfully terminate the older African-American architects that it refused to convert unconditionally to the DGS pay scale.   Upon information and belief, the government's privatization action violates D.C. Code § 2-352.05.

## CAUSES OF ACTION
### COUNT I

Race Discrimination
42 U.S.C. § 2000e, et seq, Title VII of the Civil Rights Act
D.C. Code § 2-1401.01, et seq., 42 USC §§ 1981 and 1983, DC Human Rights Act

44.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

45.     Plaintiff is a member of a protected class.

46.     Because of his race, Plaintiff was subjected to the Defendant's unlawful discriminatory conduct, including the Agency's refusal to convert him to the proper DGS personnel and classification status and to remove him from the DGS EG classification system; Defendant's refusal to properly adjust his pay scale in compliance with applicable law; and Defendant's forced termination of Mr. Lane via a pretextual RIF.

47.     Defendant's foregoing unlawful adverse actions and continued discrimination, including non-payment of Sulart to which Mr. Lane would have been entitled  if his classification were properly converted, an effective demotion, and a termination, materially affected the terms, privileges and conditions of Plaintiff's employment.

12

48.    DGS treated Mr. Lane differently than it treated newly hired Caucasian employees and thus subjected him to different terms and conditions of his employment from the manner in which Defendant treated similarly situated white employees. Further, Defendant filed to take affirmative corrective action to redress the unlawful employment practices perpetrated against Plaintiff.

49.    Plaintiff's race was a determining and motivating factor in Defendant's unlawful conduct.

50.    Further, the reasons proffered by Defendant for its unlawful conduct were pretextual. Defendant cannot substantiate any legitimate reason(s) for its unlawful conduct.

51.    Defendant's aforementioned conduct was intentional, deliberate, willful, and reckless and in callous disregard of Plaintiff's rights.

52.    Plaintiff asserts *respondeat superior* where appropriate. .

53.    As a direct and proximate cause of Defendant's conduct, Plaintiff was humiliated, embarrassed and endured pain and suffering. Additionally, Plaintiff suffered significant loss of income, benefits, promotions, promotional opportunities, career opportunities, medical expenses, and costs. This includes back and front pay.

54.    WHEREFORE, Plaintiff respectfully prays that this Honorable Court award:

a. Compensatory damages in excess of  $300,000.00:

b. Economic and financial damages including back and front pay,  loss of promotional lost job benefits, lost promotion and cost of living opportunities,  and retirement benefits;

c. Any medical costs and expenses;

d. Reasonable attorney fees, costs, and expenses incurred for this action;

13

e. Declaratory relief regarding the proper interpretation and application of the 2011 DGS creation Act and other laws, and injunctive relief;

f. Equitable and injunctive relief, including appropriate actions to require the District to enforce its personnel laws and to no longer discriminate against older African-American employees in DGS;  and

g. Award such other and further relief as this Honorable Court deems just and proper.

## COUNT II

### Age Discrimination
29 U.S.C. § 623(a), Age Discrimination in Employment Act
D.C. Code § 2-1402.11 D.C. Human Rights Act

55.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

56.     The ADEA and the DCHRA makes it unlawful for an employer to take adverse action against an employee because of such individual's age. 29 U.S.C. § 623(a); D.C. Code § 2-1402.11.

57.     At all relevant times, Plaintiff was over the age of 60.

58.     Because of his age, Plaintiff suffered multiple adverse employment actions including, but not limited to, the government's refusal to properly compensate him as required by law, a subsequent demotion and a subsequent termination.

59.     The Defendant did not subject similarly situated Architects and/or Project Managers under the age of 40 to the same or similar adverse actions complained of herein, and further properly classified and compensated said employees.

14

60.     Less experienced similarly situated Architects and/or Project Managers, under the age of 40, were hired at a higher pay scale and/or paid a higher wage than Plaintiff for the same or similar work performed during the relevant time period.

61.     Upon information and belief, the less experienced similarly situated Architects and/or Project Managers under the age of 40, hired at a higher pay scale and/or paid a higher wage than Plaintiff for same or similar work performed during the relevant time period, includes, without limitation, the following District of Columbia employees: R.C., C.W., and V.S.

62.     Plaintiff's age was a determining and motivating factor in Defendant's unlawful conduct toward Plaintiff.

63.     The reasons proffered by Defendant for its unlawful conduct are pretextual; Defendant cannot further offer any legitimate reason(s) for its unlawful conduct.

64.     Defendant's aforementioned conduct was intentional, deliberate, willful, reckless and in callous disregard of the rights of Plaintiff because of his age (over forty years).

65.     Defendant discriminated against Plaintiff because of his age by engaging in, tolerating, or failing to take affirmative action to correct and redress certain unlawful employment practices.

66.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *respondeat superior*.

67.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer harm, from past and future loss of income,

benefits, promotion and promotional opportunities, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

68.     Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering, and his injury is permanent in nature. Further, Defendant's treatment and actions were ongoing.

**COUNT III**

Retaliation

29 U.S.C. § 623(a), Age Discrimination in Employment Act
42 U.S.C. § 2000e, et seq.: Title VII of the Civil Rights Act
D.C. Code § 2-1401.01, et seq.: 42 USC §§ 1981 and 1983; DC Human Rights Act
D.C. Code § 2-1402.11 D.C. Human Rights Act

69.     Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

70.     On or about February 20, 2014 and thereafter, Mr. Lane complained about the Agency's practices, which he aforementioned, believed to constitute unlawful race and age discrimination.

71.     Additionally, on or about August 21, 2014 Mr. Lane participated in meetings at EEOC and DC Department of Human Relations to investigate DGS' adverse employment action (loss of pay), as well as its effective arbitrary and involuntary demotion.

72.     On or about November 17, 2014 Mr. Lane refused to sign an agreement to the DGS personnel action which proposed a loss of 8 steps, an unlawful adverse employment action (loss of pay), as well as an arbitrary and involuntary demotion.

73.     In September, 2014, Plaintiff further articulated and communicated his concerns via Counsel, to Agency Management.  On December DGS General Counsel, Mr. Charles Brown

Esq., by letter denied "any disparate treatment of these employees based upon age or any other protected status." Thereafter, neither then correct their actions, retaliated by terminating Mr. Lane via a RIF founded on a manufactured and pretextual realignment.

74.  As a result of Plaintiff and his colleague's ongoing and consistent complaints, Defendants developed a personal animus towards them.

75.   During May 2015, DGS initiated its adverse action against Mr. Lane via an illegal realignment, a subsequent RIF, and ultimately his termination.

76.    On July 2, 2015 Mr. Lane, who refusal to sign an agreement that demoted his grade and step compensation, and which failed to properly compensate him, was terminated as part of the RIF.

77.    Mr. Lane subquently filed an application with EEOC for charges against the Department of General Services for discriminatory practices that forced older employees to accept lower grade and steps or otherwise be terminated.

78.    Mr. Lane also alleged that the Department of General Services were retaliatory.

79.    Such retaliatory actions violated 29 U.S.C. § 623(a), Age Discrimination in Employment Act; 42 U.S.C. § 2000e, et seq, Title VII of the Civil Rights Act; 42 USC § 1981 and 1983, D.C. Code § 2-1401.01, et seq., DC Human Rights Act; and D.C. Code § 2-1402.11 D.C. Human Rights Act.

## COUNT IV

### Misuse and Diversion of Government Funds

80.    Plaintiff incorporates all allegations contained in the preceding paragraphs as if fully set forth herein.

81.    Notwithstanding the mandate of the 2011 legislation that established DGS, DGS maintained Plaintiff and at least seven (7) employees on its legislatively approved and appropriated budget while simultaneously refusing to convert and transfer them to the DGS payroll.  DGS then falsely stated to legislative authorities its budgetary intentions and public funds for purposes not stated.

82.    Moreover, at all times referenced herein pertinent to the subject RIF resulting in Plaintiff's termination, there were "sufficient funds approved within the DGS budget" to justify its continued employment of Plaintiff.

83.    Defendant, through its Executive branch decision makers responsible for managing the District's budget, enjoyed a duty to uphold the laws of the District of Columbia, including the proper expenditure and management of public funds.

84.    Based on the actions described herein, the District through its decision makers, failed to uphold that duty by, *inter alia,* improperly reprogramming appropriations without permission and in fact tacitly, if not explicitly, approved and continue to approve the misuse and diversion of public funds that cannot be recaptured for Plaintiffs' use after September 30, 2011.

85.    There is a close relationship between individual Plaintiff, as both a taxpayer and employee, residing in the District, and the direct palpable injury that he experienced as a result of the government's actions.

86.    The Plaintiff's interest as a taxpayer of the District in the application and expenditure of

its moneys is direct and immediate; moreover, the requested injunctive relief needed to prevent governmental misuse is an appropriate one.

87.     As a direct and proximate result of the Defendant's unauthorized and improper misuse of public funds, Plaintiff suffered imminent, actual and irreparable harm.

**WHEREORE,** Plaintiff respectfully request that this court to immediately (1) ORDER Defendant to restore funds authorized for Plaintiff's position in the budgets for fiscal years: 2013-2016, as approved by the Council of the District of Columbia; and (2) further, enjoin Defendant, District Government, from terminating jobs which would have otherwise been properly funded and preserved except for its illegal reallocation of said funds.

## JURY DEMAND

*Plaintiff demands a trial by jury on all issues set forth herein.*

Respectfully submitted,

Donald M. Temple
Donald M. Temple #408749
1310 L Street N.W., Suite 750
Washington, D.C. 20005
Tel: (202) 628-1101
Fax: (202) 628-1149
dtemplelaw@gmail.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on this 28 of June, 2017, that Plaintiff's Amended Complaint was served by first-class mail, postage prepaid, to:


Serve: Honorable Karl A. Racine,
Attorney General, District of
Columbia
c/o Designated Representative
Office of the Attorney General for D.C.
441 Fourth Street, N.W.
Washington, DC 20001


_____/s/_____

Donald M. Temple, Esq.

# EXHIBIT





**RECEIVED**

2014 JUN 16 PM 3: 31



**Office of Human Rights**
DISTRICT OF COLUMBIA

# EMPLOYMENT INTAKE QUESTIONNAIRE
### COMPLETING THIS INTAKE QUESTIONNAIRE DOES NOT CONSTITUTE THE FILING OF A DISCRIMINATION CHARGE.

*Required Fields

| *Today's Date: June 16, 2014 | *Name: EILEEN L. JENKINS |
|---|---|

*Address: 7978 INVERNESS RIDGE ROAD, POTOMAC, MD 20854   *City/State/Zip:

E-mail: Artist2011@gmail.com

*Home Tel #: (202) 549-1475   *What language do you prefer to communicate in?
✓English __Spanish __Amharic __Chinese __Vietnamese __Korean
__Other (Please list) _____

Work Tel #: (202) 345-9512

**IF REPRESENTED BY COUNSEL, PLEASE PROVIDE THE FOLLOWING:**
Name: _____   Telephone/Fax: _____
Address: _____   E-mail: _____
Please note: If you are represented by counsel or retain counsel prior to your scheduled intake interview, the counsel must either (1) be present with you for the duration of your intake interview, or (2) withdraw his/her appearance from the interview by submitting a letter to the Office indicating that the interview may take place without his/her representation.

Do you require a reasonable accommodation?  If so, please explain: No

Do you require language interpretation?  If so, what language? No

Name of company or organization:
DGS District General Services
Name and Title of principal officer (i.e. President, Owner, Human Resources Manager): Reeves Center
Construction, Cap. Construction, 2000 14th St NW
Address: 250 11St NW   City/State/Zip: WASHINGTON DC 20009
Tel #: (202) 3__   Fax #: _____   E-mail Address: _____

*Do you feel you were discriminated against because of your: (Please check appropriate box.)

| ✓ Race | ☐ Sex | ✓ Age | ☐ Family Responsibilities | ☐ Sexual Orientation |
|---|---|---|---|---|
| ☐ Political Affiliation | ☐ Disability | ☐ Genetic Information | ☐ Gender Identity or Gender expression | ☐ Marital Status |
| ☐ National Origin | ☐ Religion | ☐ Personal Appearance | ☐ Color | ☐ Matriculation |

✓ Alleged violation occurred in the District of Columbia.

✓ Alleged violation occurred 365 days or less from today's date.

☐ You have not commenced any other action, civil, criminal, or administrative in any other forum based on the same unlawful discriminatory practice described herein.

| □ Family Medical Leave | ☒ Promotion | ☒ Transfer | ☒ Demotion |
|---|---|---|---|
| ✓ Retaliation | □ Sexual Harassment | □ Hostile Work Environment | □ Failure to Hire |
| □ Discharge | □ Discipline | □ Failure to Accommodate (i.e. Religion, Disability) | |
| □ Other: _____ | | | |

☑ You have filed an informal complaint with an agency assigned EEO Officer/ Counselor.

Counselor's Name: DAVID PRINCE

Counselor's Agency: DBH

Counselor's Telephone Number: (202) 727-4559

Date Filed: _____  Date of Exit Letter: _____

*Have you been employed with this company for at least one (1) year and have worked at least one thousand (1,000) hours?
☑ YES □ UNO

| # (202)439-2583 | (202)409-9768 | |
|---|---|---|
| Name: DONNA GREEN | Name: Micheal Lane | Name: _____ |
| E-mail Address: bonnie.green | E-mail Address: michael.lane | E-mail Address: _____ |
| Telephone: @dc.gov | Telephone: @dc.gov | Telephone: _____ |

In 2011 our Design Unit under Capital Construction (Alan Lew) was absorbed by DGS. Existing Employees were transferred "on paper" only so District employees "keeping current" till at grade raises. Salaries were "not" adjusted to reflect current DC "pay Scales". Speaking of DGS "all" new hires receive current "pay scale compensation." Persons under 50 male & female are hired @ substantially more while performing the same duties, some with less qualifications & experience.

**SUBMITTING THIS INTAKE QUESTIONNAIRE DOES NOT CONSTITUTE THE FILING OF A CHARGE.**

Please return this form by mail or in-person to: 441 4th Street NW, Suite 570N, Washington DC, 20001.

The DC Office of Human Rights was established to eradicate discrimination, increase equal opportunity and protect human rights for persons who live, work, or visit the District of Columbia. The receipt of this complaint form by the Office of Human Rights will lead to an intake interview.

*Signature of Potential Charging Party _____  *Date 6/16/14

Albert Santiago
Will Contact: 10 days

Schedule Intake
Mediation

## EXIT LETTER AND NOTICE OF RIGHT TO FILE A
## FORMAL DISCRIMINATION COMPLAINT



**CONFIDENTIAL**

**FROM:**    David Z. Prince, J.D., CPM         **DATE:** June 5, 2014
             Equal Employment Manager, DBH

**TO:**      Ms. Eileen Jenkins
           Department of General Services     **RECEIVED:** *Eileen Jenkins*

           Via Hand Delivery

**Reference:**   **Exit Letter Re: Informal Complaint (Failure to Compensate Appropriately
                 Based on Race (African-American) and Age (50+)**

Dear Ms. Jenkins:

This letter serves to acknowledge your request for assistance to file an informal EEO complaint with the Department of Behavioral Health (DBH) EEO Office. You complain of being part of a group of employees that is presently being denied fair compensation from the Department of General Services (DGS). According to your complaint, this group consists of about twenty (20) employees that transferred from the Office of Public Education Facilities Modernization to DGS, and that these employees are mostly African American and over the age of fifty years. You state your original job title was Architect and this job series allowed you and similarly–situated colleagues to receive compensation commensurate with this job series and classification. However, during an apparent organization re-alignment, you, and the other similarly situated transitioned employees, were given responsibilities as project managers although you retained and continued to be evaluated under the title Architect. You believe this transitioning process has resulted to cause you and the other similarly-situated colleagues to lose compensation that coincides with your job title.

Resolution Efforts

Please note I contacted Mr. Anthony Clark, of the DGS Director's Office. Mr. Clark directed me to Mr. Corlis Adams of the DGS General Counsel's Office. Mr. Adams stated he shared your concerns with appropriate management officials of DGS, however, they deny your compensation has anything to do with your age or race. I invited Mr. Adams to consider further discussion regarding your informal complaint, however, this invitation was not accepted and I have not heard back from DGS regarding a willingness to continue informal discussions regarding your informal complaint.

Therefore, this letter serves to conclude the Informal EEO Counseling process. Please note employees filing informal EEO complaints may request an Exit Letter at the conclusion of thirty (30) days following the first contact with the EEO Counselor and up to sixty (60) days if additional time is granted. Sixty days will elapse on June 8. Since I have not heard back from DGS, I am not able to resolve your complaint within the time allotted. Accordingly, this letter is notice of the conclusion of informal EEO counseling.

Page 2 of 2

**Appeal Rights**

If you are not satisfied with the resolution of your complaint, you may file an individual or class-based discrimination complaint with the District of Columbia Office of Human Rights. This Office resolves complaints of discrimination based on race, color, religion, national origin, sex, gender identity or expression, age, marital status, personal appearance, sexual orientation, family responsibilities, physical or mental disability, matriculation, political affiliation, family and medical leave act and/or reprisal in accordance with the District of Columbia Human Rights Act of 1977, as amended.

If you choose to file a complaint, you must file the formal complaint with the District of Columbia Office of Human Rights (OHR) within **FIFTEEN (15)** calendar days of your receipt of this letter.

The address is:

**D.C. Office of Human Rights**
**441 4th Street N.W.**
**Suite 570 North**
**Washington, DC 20001**
**Phone: (202) 727-4559**
**www.ohr.dc.gov**

A complaint shall be deemed timely if it is received or postmarked before the expiration of the 15-day filing period, or, in the absence of a legible postmark, if it is received by mail within five days of the expiration of the filing period. If the complaint is not filed within the 15 calendar days, the complaint shall be dismissed by OHR as untimely. The complaint must be specific and contain only those issues specifically discussed with me, or issues that are like or related to issues that you discussed with me.

If you retain an attorney or any other person to represent you, you or your representative must immediately notify the D.C. Office of Human Rights, in writing. You are also required to provide change of address and/or telephone information. You and/or your representative will receive a written acknowledgment of your discrimination complaint from the appropriate OHR agency official.

Sincerely,

EEO Counselor

June 5, 2014
Date

cc:    File

# EXHIBIT

# B

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
DEPARTMENT OF GENERAL SERVICES





## D.C. DEPARTMENT OF GENERAL SERVICES
## REQUEST FOR PROPOSALS

### GENERAL DESIGN CONSULTANT

### May 10, 2017

**Proposal Due Date:**     May 30, 2017 by 2:00 PM

**Preproposal Conference:**   May 16, 2017 at 11:00 AM

*to be held at:*

Department of General Services
1250 U Street NW, 4th Floor
Washington, DC 20009

**Contact:**     Alan Blair
Contract Specialist
Department of General Services
1250 U Street NW, 4th floor
Washington, DC 20009
(202) 645-0504
alan.blair@dc.gov

**Solicitation Number:**     DCAM-17-CS-0047

### Executive Summary

The Department of General Services ("Department" or "DGS") is issuing this Request for Proposals to engage a multi-disciplinary design firm to act as the general design consultant. Under the governmental structure for the District of Columbia, DGS serves as the central "real estate agency" for the District government.  As part of this responsibility, DGS manages the design, construction, renovation and major capital upgrades for most of the District's facilities and manages a construction portfolio of approximately $350 million a year in new construction and renovation work.  Approximately 70% of this effort supports the school buildings that are operated by the District of Columbia Public Schools ("DCPS").  DCPS operates approximately 119 active school facilities which consist of approximately 12.6 million square feet. Of the remaining 30%, approximately half of the portfolio relates to the Department of Parks and Recreation ("DPR") and half relates to other municipal agencies.

The Department desires to award two separate contracts from this procurement – one to support the DCPS portfolio and the second to support the DPR and municipal portfolio; however, the Department reserves the right to award both contracts to a single vendor should such be in the best interests of the District.

The General Design Consultant will assist DGS and its program management staff in overseeing the design function related to new construction, renovation and capital upgrades.  The Consultant's work will include:  (i) developing a program of requirements for each new project; (ii) developing, updating, and maintaining a set of design standards that will serve as the baseline for future projects; (iii) conducting quality control reviews of designs developed by the architects of record for future projects; (v) preparing, on an as-needed basis, narrative scopes of work and associated drawings and specifications for capital upgrades; and (v) preparing preliminary feasibility assessments of potential new construction projects.  The General Design Consultant will <u>not</u> serve as the architect of record on future projects and will be precluded from bidding on any project within the portfolio or portfolios that such Consultant supports for the term of the contract and the first year thereafter.

With regard to the DCPS Portfolio, the Department envisions that the General Design Consultant will support an in-house staff of approximately 5 project managers and a roster of project-specific Program Management/Construction Management firms to oversee a capital construction program that spends approximately $250 million per year.

With regard to the DPR and Municipal Portfolio, the Department envisions that the General Design Consultant will support an in-house staff of approximately 3 project managers and a more limited roster of project specific Project Management/Construction Management firms to oversee a capital construction program that spends approximately $100 million per year.

The resulting contract will have a 5 year term.  DGS anticipates that the level of effort will require approximately 2 to 3 full time architects/project managers as well as supporting staff in various engineering disciplines (i.e. MEP, structural, acoustics, IT and food service).  In order to ease administration of the program, the full time architects/project managers must work at DGS'

offices at 1250 U Street, NW, in Washington, DC.  Supporting staff (i.e. engineers and estimators) would be stationed in the successful bidder's offices.

## A.1    DCPS Portfolio Overview

The DCPS Portfolio consists of approximately 119 campuses which collectively comprise 12.6 square feet. **Attachment A** sets forth a summary list of the campuses that describes the overall size and composition of the portfolio. **Attachment B** is the current Six-Year Capital Improvement Plan for the portfolio which provides an overview of the District's spending plan for this portfolio broken down by project and/or budget aspect. Finally, **Attachment C** provides a link to the current design guidelines used by DGS to manage the DCPS Portfolio.  All three of these attachments are living documents and the Department expects that they will evolve over time.  It is believed, however, that these attachments should give prospective Offerors a general understanding of the DCPS Portfolio and the nature of the engagement.

With regard to the Design Guidelines, the Department expects that the selected Consultant will review the guidelines immediately after appointment and, if necessary, provide revisions to the same.  Offerors should include in their proposal their thoughts on the current design guidelines and their proposed approach to this part of the engagement.

DCPS also has a series of standard programs of requirements for the various areas that are typically found in school buildings (i.e. an elementary school classroom, a principal's office, a nurse's office, etc.). Offerors should undertake a preliminary review of these documents prior to submitting their proposals and include their thoughts on the adequacy of such documents in their proposal.  At present, neither DGS nor DCPS envision that a major re-write of these documents will be required.

## A.2    DPR & Municipal Portfolio Overview

The DPR and Municipal Portfolio consists of approximately 350 facilities.  The Department will make available by amendment to this RFP a list of these facilities and any current design guidelines used by DGS to manage the DPR & Municipal Portfolio *to the extent available*.  Unlike the DCPS Design Guidelines, any DPR & Municipal Design Guidelines that may exist are not comprehensive.   All of these attachments are living documents and the Department expects that they will evolve over time. It is believed, however, that these attachments should give prospective Offerors a general understanding of the DPR & Municipal Portfolio and the nature of the engagement.

With regard to the Design Guidelines, the Department expects that the selected Consultant will review the existing guidelines immediately after appointment and, if necessary, provide revisions to the same in addition to drafting new guidelines for various types of DGS projects.  Offerors should include in their proposal their thoughts on the current design guidelines and their proposed approach to this part of the engagement.

### A.3    Form of Contract

The Form of Contract will be issued by addendum.  Offerors should carefully review the Form of Contract when submitting their proposal. To the extent there are any inconsistencies between this RFP and the Form of Contract, the Form of Contract shall prevail. Offerors are further advised that they are required to submit their proposal premised upon entering into a contract that is substantially similar to the Form of Contract and that any proposed changes to the Form of Contract must be clearly identified and described in their proposal. A proposal that fails to specifically identify and describe the requested changes shall be deemed non-responsive. The Standard Contract Provisions attached hereto as **Attachment H** shall also apply.

### A.4    Compensation

The Department desires to enter into a fixed fee type of contract for those services that are described as "Basic Services" under the attached Form of Contract.  Offerors should quote a yearly price for each of the five years of the expected contract for such Basic Services. Offerors should also quote unit rates for those services described in the Bid Form.

**Other than the original proposal (which shall include both a pricing and technical response), Offerors will be required to submit copies of the pricing portion of their proposal (including the Form of Offer Letter and any attachments thereto) separately from the technical portion of their proposal. The technical portion of the proposal consists of everything other than pricing information.**

### A.5    Economic Inclusion

This procurement is being put in the open market.  In general, Offerors will be required to subcontract at least thirty five percent (35%) of the dollar value of the contract to entities that are certified as small business enterprises by the District's Department of Local Business Development.  Please see Section C of this RFP for more details on this requirement.

### A.6    Selection Criteria

Proposals will be evaluated in accordance with **Part D** of this RFP.  The following evaluation criteria will be used:

- Experience & References (20 points)
- Key Personnel (30 points)
- Cost (25 points)
- Project Management Plan (15 points)
- Proposed Design Guidelines & Program of Requirements (10 points)

## A.7   Procurement Schedule

The schedule for this procurement is as follows:

- Issue RFP
- Pre-proposal Conference
- Last Day for Questions/Clarifications
- Proposals Due
- Notice of Award

- May 10, 2017
- May 16, 2017 at 11:00 AM
- May 19, 2017
- May 30, 2017 at 2:00 PM
- on or about June 19, 2017

## A.8   Attachments

| | |
|---|---|
| Attachment A | - DCPS Campuses |
| Attachment B | - 6 Year DCPS Capital Improvement Plan |
| Attachment C | - General Design Consultant DCAM-17-CS-0047 |
| Attachment D | - Standard Program Elements |
| Attachment E | - Form of Offer Letter/Bid Form |
| Attachment F | - Bidder/Offeror Certification Form |
| Attachment G | - Tax Affidavit |
| Attachment H | - Standard Contract Provisions |
| Attachment I | - SBE Subcontracting Plan |
| Attachment J | - First Source Agreement |
| Attachment K | - 2017 Living Wage Act |
| Attachment L | - Past Performance Evaluation Form |
| Attachment M | - EOO Policy Statement |
| Attachment N | - Service Contract Act |

# SECTION B
# SCOPE OF WORK

**B.1    General Intent**

In general, the Consultant will assist DGS and its project managers in managing the design function related to the Department's portfolio. It is important to note, however, that the Consultant will not serve as the architect of record for any of the projects, but rather will be tasked with assisting the Department in developing design guidelines, performing quality control checks on designs submitted by the architect of record, review design submissions to confirm that they conform to the design guidelines, and for smaller projects, preparing narrative scopes and/or bridging design documents that will be put out to bid with design/build contractors. The Consultant will also be tasked with conducting feasibility assessments of potential projects to assess whether the proposed project is feasible from a design perspective.

**B.2    Scope of Work**

**B.2.1   Program Coordination & Day-to-Day Support**

The Consultant shall provide a full-time staff of at least two (2) licensed design professionals at DGS' offices. These individuals shall provide full-time and continuous support to DGS' program management staff administering the assigned portfolio(s). Such individuals shall attend meetings as requested, prepare memoranda and other documents as requested.

**B.2.2   Update Design Guidelines**

Immediately upon appointment, the Consultant shall review and revise the current Design Guidelines. Unless a more extensive re-write is requested by DGS, this work shall be completed within 120 days after appointment. This work will be managed and overseen by the on-site staff; however, support personnel may be assigned as necessary. This task shall consist of the following activities:

**B.2.2.1 Preliminary Assessment.** Within three weeks after appointment, the Consultant shall prepare and submit to the Department a preliminary assessment of the current design guidelines. This assessment shall, at a minimum, include: (i) a historical over-view of the guidelines (when they were drafted, the number of revisions, etc.); (ii) the Consultant's assessment as to whether the current guidelines are generally consistent with current market expectations for such documents; and (iii) whether the current guidelines represent DCPS' current thinking and expectations for facilities. The assessment shall also include specific recommendations as to the appropriate next steps.

**B.2.2.2 Work Plan.** Within one month after the preliminary assessment is submitted, the Consultant shall identify those portions of the guidelines that require revision. To the extent that the Department determines that a complete re-write of the guidelines is required, the Department and the Consultant shall develop an agreed upon scope of work within such one month period. As part of this effort, the Consultant shall meet with the relevant individuals within DCPS and

obtain DCPS' perspective with regard to the guidelines and what portions may require adjustment to better meet DCPS expectations. The Consultant shall also undertake a best practices review to assess whether the current design guidelines are appropriate for their intended purpose and use by a large, urban school district. The Consultant shall meet with the Department's representatives to review the recommendations. At the conclusion of this phase, the Department shall provide direction to the Consultant that specifies the required revisions to the design guidelines.

**B.2.2.3 Design Guideline Revisions.** Unless otherwise agreed to by the Department in writing, the Consultant shall complete the necessary revisions to the Design Guidelines within sixty (60) days after the Department provides direction as to the required scope of work. The Consultant shall submit draft copies of the revisions to the Department and DCPS. Such drafts shall either be redlined or bubbled to show the proposed changes. The Consultant shall also submit a memorandum or other narrative that explains the rationale underlying the proposed revisions. The Consultant shall schedule one or more work sessions to review and discuss the proposed revisions with the Department and DCPS. The Consultant shall incorporate such revisions as may be requested by the Department and shall submit a final copy.

### B.2.3 Prepare Preliminary Program of Requirements

From time to time and as requested by DGS, the Consultant shall prepare a preliminary program of requirements for major projects to be initiated by the Department. Depending upon the nature of the project, the Consultant shall proceed as follows:

**B.2.3.1 DCPS.** If the project falls within the DCPS portfolio, the Consultant shall use the Design Guidelines as the basis for the program of requirements and shall prepare an Educational Specification ("Ed Spec"). The Consultant shall meet with the appropriate personnel from the DCPS central office as well as the current principal for the facility to ascertain (i) the current and proposed student population; (ii) feeder patterns; and (iii) desired program elements. The Consultant shall endeavor to develop the Ed Specs so as to ensure a uniform level of quality and functionality among schools within the DCPS portfolio. The Consultant shall submit draft copies of the proposed Ed Spec to the Department and DCPS and shall meet with them as necessary to obtain additional input. Subsequent to those meetings, the Consultant shall prepare a revised draft of the Ed Spec and submit it to the Department and DCPS for review and approval. The revised draft shall be redlined or bubbled to show the proposed changes. The Consultant shall also submit a memorandum or other narrative that explains the rationale underlying the proposed revisions.

**B.2.3.2 DPR.** If the project falls within the DPR portfolio, the Consultant shall work with the Department and DPR to develop a program of requirements for the project. As part of this effort, the Consultant shall conduct interviews with the relevant individuals within DPR and, if so directed by DGS, with community stakeholders to develop a set of goals and needs that the project should address. Based on those efforts, the Consultant shall prepare a preliminary program of requirements that includes (i) a documentation of the methodology used; (ii) an executive summary; (iii) value and goal statements; and (iv) space listings by function and size, with relationship diagrams, and space program sheets. The draft program should also include a

preliminary schedule and initial cost estimate. The initial cost estimate included in such report shall be based on cost data provided by DGS' independent cost consultant. The Consultant shall submit draft copies of the program of requirements to the Department and DPR and shall meet with them as necessary to obtain additional input. Subsequent to those meetings, the Consultant shall prepare a revised draft of the program of requirements and submit it to the Department and DPR for review and approval. The revised draft shall be redlined or bubbled to show the proposed changes. The Consultant shall also submit a memorandum or other narrative that explains the rationale underlying the proposed revisions.

### B.2.4   Design Quality Reviews

The Consultant shall conduct peer reviews of design documents submitted by the various architects and engineers of record as and when directed by the Department. In general, the Department will require that the Consultant conduct a program verification review at the end of the schematic phase, and design reviews of the design development documents and permit set. In select instances, the Department may request the Consultant to review concept design packages, and issued for construction sets.

**B.2.4.1 Concept Design Review.** This review will not normally be required by the Department as the Department will normally rely upon the assigned project manager to perform this review. If requested, however, the purpose of such review is to assess whether the draft concept design: (i) contains the level of detail required by architect's contract; (ii) complies with program requirements; and (iii) includes project elements that represent program expansion. The Consultant shall submit a brief written memorandum with its findings to the Department's lead project manager for the project. To the extent the concept design includes elements that are not required by the program, the Consultant shall provide an estimate of the additional cost associated with such elements and shall provide a recommendation as to whether such elements should be included. Unless otherwise directed, the concept design review shall be completed within five business days after the concept design is submitted by the architect of record.

**B.2.4.2 Schematic Design Review.** The purpose of this review is to verify whether the schematic design complies with the program. The Consultant shall submit a brief written memorandum with its findings to the Department's lead project manager for the project. To the extent the schematic design includes elements that are not required by the program, the Consultant shall provide an estimate of the additional cost associated with such element and shall provide a recommendation as to whether such element should be included. Unless otherwise directed, the schematic design review shall be completed within five business days after the schematic design is submitted by the architect of record.

**B.2.4.3 Design Development Review.** The purpose of the design development review is to assess whether the design development documents: (i) are consistent with the program of requirements; (ii) are consistent with and meet the intent of the applicable design guideline; (iii) show a level of completeness, organization and coordination that is consistent with architectural standards and expectations; and (iv) contains the level of detail required by the architect's contract. In general, the Department expects that the schematic design will include more detailed MEP information, including one-line diagrams and proposed finishes for key spaces. To the

extent such is required and included in the design development documents, the Consultant shall review the proposed MEP system and finish selections and whether they are consistent with the applicable design guideline and DGS' expectations for such equipment and finishes. The Consultant shall submit a brief written memorandum with its findings to the Department's lead project manager for the project. Unless otherwise directed, the design development review shall be completed within ten business days after the design development review is submitted by the architect of record. If the project is being delivered through a design/build or other such method where the builder's price will be based on the design development documents, the Consultant shall assess whether the design development documents contain a sufficient level of detail to adequately define and protect the Department.

**B.2.4.4 Permit Set Review.** The purpose of the design development review is to assess whether the permit set: (i) show a level of completeness, organization and coordination that is consistent with architectural standards and expectations for a permit set of documents; (ii) are consistent with and meet the intent of the applicable design guideline; and (iii) contain the level of detail required by the architect's contract. The Consultant shall submit a brief written memorandum with its findings to the Department's lead project manager for the project. Unless otherwise directed, the permit set review shall be completed within ten business days after the permit set is submitted by the architect of record.

**B.2.4.5 Issued for Construction Sets.** If requested, however, the purpose of the schematic design review is to assess whether the IFC documents show a level of completeness, organization and coordination that is consistent with architectural standards and expectations for a the documents. The Consultant shall submit a brief written memorandum with its findings to the Department's lead project manager for the project. Unless otherwise directed, the permit set review shall be completed within five business days after the documents are issued by the architect of record.

**B.2.4.6 Qualification of Reviewers.** Design reviews shall be conducted by individuals who meet the licensing requirements that would otherwise be applicable if the reviewers were serving as the architect or engineer of record.

## B.2.5   On-Call Design Services

As and when requested by DGS, the Consultant shall prepare the necessary documents to bid small capital improvement projects (i.e. tenant fit-out work, system replacements, etc.). In general, such projects will be bid on a "design-assist" basis based on sketches and narrative scopes of work; however, detailed construction documents may be required in certain instances and the Consultant should have the necessary staff available to provide such documents if required.

## B.2.6   Feasibility Assessments

As and when requested by DGS, the Consultant shall prepare feasibility assessments of proposed projects from a technical design perspective. These assessments shall include the following: (i) an assessment of whether the site's physical characteristics (size, shape, slope and surface and

subsurface conditions) are consistent and appropriate for the proposed project; (ii) a preliminary zoning analysis; (iii) a "test fit" of the site that shows the approximate footprint and massing of the project; (iv) a preliminary infrastructure analysis that addresses utility and transportation infrastructure and whether such is appropriate for the proposed project; and (v) a preliminary cost estimate for the project. Unless otherwise directed by DGS, the preliminary cost estimate included in such report shall be based on cost data provided by DGS' independent cost consultant.   The Consultant shall submit draft copies of the feasibility assessment to the Department and shall meet as necessary to obtain additional input.   Subsequent to those meetings, the Consultant shall revise the feasibility assessment to reflect input from the Department and submit the revised draft to the Department for review and approval. The revised draft shall be redlined or bubbled to show the proposed changes.   The Consultant shall also submit a memorandum or other narrative that explains the rationale underlying the proposed revisions.

**B.3    Administrative Provisions**

The Program Management Contractor shall be required to submit the reports as described in this **Section B.3.**

**B.3.1  Monthly Report.**  The Consultant shall prepare and submit a monthly report to the Department's Deputy Director for Capital Construction that summarizes the activities that were performed during the month and the financial status of the Consultant's contract. A copy of this report shall be provided to the Contracting Officer.

**B.3.2  Weekly Status Report.**  The Consultant shall provide a weekly status report to the Department's Deputy Director for Capital Construction. This report shall provide: (i) a listing of the activities that were completed by the Consultant during that week; (ii) the expected activities that will be completed in the next week; and (iii) specifically identify any substantial design problems that were noted in design reviews that were completed during that week and provide an assessment as to the nature of any such design problem and potential corrective action. This report can be prepared in bullet format.

**B.4    Standard of Care**

In performing its duties hereunder, the Consultant shall use a level of skill and exhibit a standard of care that is appropriate for design professionals in the Washington, D.C. metropolitan area.

**B.5    Deliverable List**

    .1    Preliminary Assessment (Section B.2.2.1)
    .2    Work Plan (Section B.2.2.2)
    .3    Design Guideline Revisions (Section B.2.2.3)
    .4    Education Specifications (if a DCPS project) (Section B.2.3.1)
    .5    DPR Program of Requirements (if a DPR project) (Section B.2.3.2)
    .6    Concept Design Review Memorandum (if required) (Section B.2.4.1)
    .7    Schematic Design Review Memorandum (Section B.2.4.2)

.8     Design Development Review Memorandum (Section B.2.4.3)
.9     Permit Set Review Memorandum (Section B.2.4.4)
.10    Construction Set Review Memorandum (if required) (Section B.2.4.5)
.11    On-Call Design Services (if required) (Section B.2.5)
.12    Feasibility Assessments (if required) (Section B.2.6)
.13    Monthly Report (Section B.3.1)
.14    Weekly Status Report (Section B.3.2)

**B.6     Key Personnel; Liquidated Damages**

**B.6.1   Identification of Key Personnel.** The General Design Consultant shall include, at a minimum, the following key personnel:  (i) 2 to 3 architects/project managers that will be committed full time throughout the term of the contract; and (ii) support staff in various engineering disciplines (i.e. MEP, structural, acoustics, IT and food service).  The selected General Design Consultant will not be permitted to reassign any of the key personnel unless the Department approves the proposed reassignment and the proposed replacement.

**B.6.2   Liquidated Damages.**  If the General Design Consultant removes or reassigns one of the key personnel (excluding, however, instances where such personnel become unavailable due to death, disability, or separation from the employment of the General Design Consultant or any affiliate of the General Design Consultant) without the prior written consent of the Department's Designated Representative, the General Design Consultant shall pay to the Owner the sum of Twenty Five Thousand Dollars ($25,000) as liquidated damages.  These liquidated damage amount shall not bar recovery of any other damages, costs or expenses other than the Department's internal administrative costs.  In addition, the Department shall have the right, to be exercised in its sole discretion, to remove, replace or to reduce the scope of services of the General Design Consultant in the event that a member of the key personnel has been removed or replaced by the General Design Consultant without the consent of the Department.